** NOT FOR PUBLICATION **

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
| JAMES KOVALCHIK, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 08-507 |
| | : | |
| v. | : | **OPINION** |
| | : | |
| GEORGE F. WAGNER, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

## WOLFSON, United States District Judge:

Before the Court is a Motion for Summary Judgment by defendants, George F. Wagner, Scott Nodes, Lieutenant Tim Fleming, Sergeant Danielle Lauyer, Corrections Officer Matthew Walker, Hunterdon County Department of Public Safety, Corrections Division, Hunterdon County Department of Public Safety and Hunterdon County Board of Chosen Freeholders to dismiss Plaintiff James Kovalchik's (hereinafter "Plaintiff" or "Kovalchik") Complaint alleging that Defendants failed to protect him from an assault by another inmate. The Complaint alleges that Defendants Wagner, Nodes, Fleming, Lauyer, and Walker violated Kovalchik's Eighth Amendment rights. The Complaint, further, alleges a Monell claim against Hunterdon County Department of Public Safety, Corrections Division, Hunterdon County Department of Public Safety and Hunterdon County Board of Chosen Freeholders (collectively, "County Defendants") for failing to

1

properly train and supervise Defendants Nodes, Fleming, Lauyer and Walker (all defendants collectively referred to hereinafter as "Defendants").

## I.     BACKGROUND

## A.     Facts

Because the Court is considering the facts in the context of Defendants' Motion for Summary Judgment, the Court must view the facts in the light most favorable to Plaintiff.

On October 26, 2007, Plaintiff Kovalchik was a prisoner at Defendant Hunterdon County Jail, serving a six-month sentence for Driving While Intoxicated.  He was assigned to the minimum-security, work release pod.  Rafael Torres was a pre-trial detainee also at the Hunterdon County Jail and assigned to the same pod while he awaited trial on charges of aggravated assault on a Law Enforcement Officer, a crime allegedly committed while he was an inmate at another facility.  Torres assaulted Kovalchik, and this suit arises out of that assault.

### 1.     Defendants' Roles and Responsibilities

At all times relevant, Defendant George F. Wagner was the Director of Public Safety for Hunterdon County, New Jersey, whose responsibilities included oversight of operations of the Division of Corrections and to provide training and supervision of Division of Corrections personnel.  Lamont Cert., Ex. A.  Defendant Scott Nodes was the Correctional Administrator for the Hunterdon County Department of Public Safety, Corrections Division ("HCDPS").  Id.  Specifically, Defendant Nodes was the duly appointed Administrator for the Hunterdon County Jail.  Id.  Defendants Fleming,

Lauyer, and Walker were Corrections Officers at the Hunterdon County Jail responsible for the intake and classification of inmates at the jail.  Id.  Defendant Fleming held the rank of Lieutenant, and Defendant Lauyer held the rank of Sergeant. Id.

### 2.      Booking by Lauyer

Defendant Lauyer booked Torres upon his arrival at the facility.   In her examination of him, it was noted that he had the words "OGC" tattooed on his left arm.  The record, further, suggests that Lauyer reviewed Torres' paperwork, including proof of his current charges.  She signed off on a document indicating that he was fit for jail, and sent him on to be classified by Defendant Fleming.  Patti Cert., Exh. AA at 3.

### 3.      Classification by Fleming

HCDPS has an inmate classification system, used by correction professionals to indentify the needs of inmates and to ensure safe and proper housing.  Classification determines in which post or unit an inmate will be housed.  Fleming Dep. at 35:16-20, 37:19-22.  The Initial Custody Assessment Scale, the classification system used by HCDPS, is comprised of two sections.  Patti Cert., Ex. S; Initial Custody Assessment Form, Patti Cert., Ex. T ("Classif. Form").  Section 1 assigns points to an inmate based on the current charge, past criminal history, institutional disciplinary record, and alcohol/drug use history, *inter alia*.  A total of 31 points can be allotted under this section.  Also, in this section, up to 3 points can be deducted for stability factors such as age, employment and residency of twelve months or longer at the same address.

For the Institutional Disciplinary History category in Section 1, the form directs the classifying officer to "[c]onsider the inmate's entire disciplinary history including the

3

current admission.  If the inmate has not received any disciplinary reports or has received only minor reports with no segregation time, enter 0." Id. at 2.  For stability factors, the form explains, by way of example, that an inmate "who had been employed for 6 months at the time of arrest and living at the same address for 2 years" would be entitled to have 3 points deducted.  Id. at 3.

Once the total number of points from Section 1 is tallied, the ICIS Form suggests a classification level depending on the total number of points allotted.  A score of 5 or lower on the scale results in a minimum custody classification.  A score between 6 and 10 points results in medium custody status, and 11 or higher results in maximum custody status.

Section 2 of the ICIS Form consists of 12 categories of Special Management Concerns that can lead to an override of the initial custody score derived in Section 1. These concerns include "serious violent threat," "known gang affiliation," and "known management problem," *inter alia*.  Patti Cert., Ex. CC; Initial Custody Assessment Scale, Patti Cert., Ex. T ("Classif. Scale").  The form describes the "Serious Violence Threat" category as designed for those who have " a documented history of violent conduct, such as murder, rape, assault, intimidation involving a weapon, and arson . . . while confined or while in the community." Id. at 4.  "Known Gang Affiliation" is explained as for those inmates "known to be a member of a racial, political, or religious group that uses violence to achieve its goals within a correctional setting and/or in the community and this affiliation is considered to be a management issue in the facility." Id. at 5.  With regard to "Known Management Problem," the form explains that this

4

category relates to "[t]he inmate [who] has a documented history of management problems while confined . . . [and] is known to have incited, provoked, and/or agitated peers, disrupted facility operations, and/or to have demonstrated a substantial lack of cooperation with authority figures."  Id.  Finally, the form states that an override recommendation is appropriate "[i]f the classification specialist believes there are factors that warrant a custody classification which is different form that which is indicated by the scale …."  Id. at 6.

Detective Fleming conducted the classification assignment of inmate Rafael Torres.  Fleming Dep. at 35:6-13.  He gave inmate Torres an initial score of 5, which indicated that a minimum security placement may be appropriate.  See ICIS Form; Patti Cert., Ex. U, Initial Custody Assessment of Rafael Torres ("Initial Torres Assess.").  In Section 1, he allotted Torres two points for Severity of Current Charge, which was Aggravated Assault on a Law Enforcement Officer, and one point for Serious Offense History, which was "possession of CDS."[1]  For Alcohol/Drug History, Torres was given a 1.  In addition, Fleming deducted one classification point for "stability" based on Torres' residence at the same address—another correctional institution—for the year preceding his incarceration.[2]  Plaintiff presents expert opinion indicating this is not the

---

[1]  Fleming determined this by conducting a criminal history search of Torres in New Jersey's criminal history check system.  Fleming Dep. at 71:20-23.

[2]  Plaintiff states in his opposition papers that Defendant Lauyer mistakenly deducted the stability point.  Pl. Opp. at 10.  However, my review of the record does not support this contention.  Only Fleming's name is listed on Torres' classification form as the classifying officer.  Furthermore, it is Plaintiff's responsibility to point to specific evidence in the record to support each of his contentions.  His brief included not one

type of stability factor contemplated in the assessment scale.  Patti Cert., Ex. S, Garvey Expert Rep. 4.

Fleming did not award Torres any points for Institutional Disciplinary History, although Torres had six such infractions at other facilities, including assaulting a Law Enforcement Officer, two fights, and administrative segregation.  Id.; Patti Cert., Ex. DD, Institutional History of Inmate Torres ("Torres History").  Specifically, Torres' Institutional History forms indicate that he was to be kept separate from another inmate named Ragaie Abuali.  In addition, the history noted that Torres had been recently disciplined for using "abusive/obscene language" with institutional staff, and for fighting.  Id. at 3.  According to Fleming, Torres' institutional history was not sent from his prior institutions, and Fleming did not consider it his responsibility to investigate any prior institutional history.  When asked at his deposition if he would typically refer to an inmate's institutional history, he replied "Not unless I had information that there had been some sort of problems in the past."  Fleming Dep. 87:9-10.

Fleming, further, testified in his deposition that he did not check off any special management concerns because he "looked at the level of the [current] charge and [Torres'] previous . . . conviction …."  Id. at 127:9-11.  Fleming acknowledged that he did not receive any training on whether to designate a special management concern when the charge is a "low" one.  Id. at 127:17-21.  Regarding the gang affiliation category,

---

citation to the record, thereby extending the amount of time that was required of the Court in reviewing the parties' submission and rendering a decision.

Fleming testified that he was not sure what Torres' "OGC" tattoo meant, though he thought it might refer to "organized gangster." Id. at 124:24 – 125:3. At that time, he had not yet received any specific training on identifying gang members either. Id. at 125:4-10.

Based on Fleming's classification, Torres was placed in the minimum-security, work release pod and cleared to work in the kitchen. Kovalchik testified at his deposition that both men worked together in the kitchen "most of the time," Kovalchik Dep. at 65:5-6, and became friends. Id. at 93:14-16.

**4.    Gang Allegations and Walker's Investigation**

Shortly following Torres' initial classification scoring and assignment to minimum security risk housing, twelve anonymous inmates in the minimum-security pod signed an inmate request form stating that inmate Torres and another inmate were involved in gang activity. The first request form, dated July 12, 2007, states:

> There are certain individuals down here who are fearful of their safety and well being. The situation has changed drastically down here in the past few days upon the arrival of a new inmate. There is certain gang activity that is creating an intimidating and hostile environment. We are minimum security inmates who should not be subjected to this type of environment. This person is claiming he just due 4 yrs [sic] in Northern State (a maximum security prison) now he is in a minimum security dorm and is trying to extort weaker individuals. Please help. The two gang members are Luke (in 113) and the new African-American inmate (cell 112).

Patti Decl., Exh. II at 1. The request, further, indicated that the signatories did not disclose their names "for [their] safety." A second anonymous form was submitted the

following day, stating

> [w]e the inmates are scared of the blood members (112 + 113)
> in our pod!  They are to [sic] open about their background.
> Telling us we are going to have to start paying "Rent" to live
> here, "Don't touch my T.V.!"  Pushing their way around like
> they own the place.  Talking about "blood staines" [sic] + "G-
> Checking."  We are all scared for our lives!  This is NOT A
> JOKE!!  HELP

Id. at 2.  A third undated request form indicated that inmates were being threatened

when changing the channel on the television away from "BET."  Id. at 3.

Upon receipt of these forms, Defendant Walker conducted an investigation and

prepared a report dated July 13, 2007.  In that report, Walker indicated that Luke and

Torres were rehoused to "Seg" on July 13, 2007 on account of the allegations.  Patti

Decl., Exh. JJ.  He goes on to explain the result of his investigation:

> After speaking with both inmates they told me that the
> "white" inmates were starting "race wars" [Inmate] Luke told
> me that one of the white guys from the top tier in work
> release had stolen the TV remote control while Scott, the
> maintenance man, had turned his back to install the TV.
> [Inmate] Luke went on to say that the white kids in work
> release erased the "BET & Hispanic" channels.  [Inmate]
> Torres, R. said that he had confronted the guys and asked for
> them to [turn] the channels back on.  [Inmate] Luke stated
> that after the channels were programmed back on the TV
> they were shortly rehoused in Seg & the remote control was
> planted in his cell.

Walker's report, further, notes that Torres has "O.G.C." tattooed on his left forearm, and

that "O.G.C. is "a known tattoo for gang members."  Id.  The report draws no conclusion

about the tattoo or the anonymous inmate allegations.  Following the investigation,

Walker re-assigned inmate Torres back to the minimum security pod and, soon after,

Torres was cleared for kitchen duty.  Id.

> **5.      Torres' Assault against Kovalchik**

On October 26, 2007, both Kovalchik and Torres were working in the kitchen. Grilled cheese and ham sandwiches were being served that day for lunch.  Torres does not eat pork, so he requested that the ham be left off his sandwich.  When Torres went to retrieve his specially-made sandwich, it was missing and he blamed Kovalchik for its disappearance.  Kovalchik Dep. 81:11-23 – 88:25.

After the two exchanged heated words in the public area of the pod, Torres told Kovalchik to "put your boots on."  Id.  Kovalchik agreed to follow Torres to his cell in order to try and resolve the dispute amicably.  At first, Kovalchik did not understand what "put your boots on" meant, but then he realized that Torres intended to fight.  Id. at 91:23 – 92:13.  Kovalchik told Torres that he would not fight him, but would try to talk through their dispute.  He believed they could work it out because they had been friends, id. at 93:11-16, and because his pre-incarceration background was in social work.  Kovalchik Afft. at ¶ 11.

Upon entering Torres' cell, Torres used a bent spork to place a towel over the opening to his cell, so that guards could not see in during the fight.  Kovalchik Dep. at 98:1-8.  At approximately 12:30 p.m. Torres violently assaulted Kovalchik in Torres' cell by repeatedly punching Plaintiff about the face and body, repeatedly kicking Plaintiff about the body, stabbing Plaintiff in the face with an eating utensil, and causing Plaintiff to fall to the floor smashing his face against the wall and floor.  Id. at 95:1-102:10.  As a result of the assault, Plaintiff suffered a fractured orbital bone and

fractured sinus cavity.  Id. at 103, 119:15-16.  Other inmates began shouting after Kovalchik entered the hallway with a bloody face.

### 6.    Prison Response to Assault

Overhearing the commotion in the pod, Officer Haring entered the area and asked Kovalchik who had injured him.  Kovalchik told him that Torres had assaulted him, and Haring immediately handcuffed and took Torres away.  Id. at 102:11-103:9.  Shortly thereafter, Torres was charged with institutional violations and assigned to disciplinary detention for thirty days.  Patti Cert., Exh. F.  He subsequently requested leniency, contending that both he and Kovalchik were fighting.  Patti Cert., Exh. H.  The Division of Corrections rejected his request, finding instead that

> numerous witnesses stated that they saw your cell door open, Kovalchik backing out of the cell and you punching him while clenching a spork in the hand that you struck inmate Kovalchik with.  As a result, inmate Kovalchik sustained a serious injury to his facial area.  It is also noted that you stated during the course of your Disciplinary Hearing . . . that when you came out of your cell, the incident was already over.  [Hence] I am not inclined to believe your current assertion that you were both fighting.

Id.

Torres was then reclassified by Fleming.  This time, Fleming gave him a total custody score of 11, a maximum security score.  Patti Cert., Exh. I.  In calculating this score, Fleming included Torres' institutional history and did not grant him the one point stability deduction he had allotted during the first classification process.  Id.

### B.    Procedural History

On January 29, 2008, Plaintiff filed the instant suit against Defendants,

asserting an Eighth Amendment conditions of confinement claim for the individual and supervisory defendants' failure to protect him from the assault by Torres, and a <u>Monell</u> claim based on the County Defendants' classification policy.[3] Defendants filed a Motion for Summary Judgment to dismiss the Plaintiff's claims in their entirety with prejudice. On March 15, 2010, Plaintiff filed a brief in opposition to defendants' Motion for Summary Judgment. Defendants filed a brief in reply to Plaintiff's opposition to the Motion for Summary Judgment on March 30, 2010.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." <u>Fed.R.Civ.P.</u> 56(c); <u>Celotex Corp. v. Catrett</u>, 477 F.3d 317 (1986); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. <u>Anderson</u>, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" <u>Marino v. Indus. Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004)

---

[3]      While Kovalchik references the Fourteenth Amendment in connection with his conditions of confinement allegations, <u>see</u> Compl. ¶ 22, the parties argue their respective positions solely under the Eighth Amendment. Accordingly, the Court construes Plaintiff's claim as sounding only under the Eight Amendment. In any event, as the Third Circuit recently held in <u>Betts v. New Castle Youth Develop. Ctr.</u>, --- F.3d --- -, 2010 WL 3528902 (3d Cir. Sept. 13, 2010), a fourteenth amendment substantive due process claim concerning conditions of confinement and failure to ensure inmate safety is foreclosed by the more-specific-provision rule. <u>Id.</u> at *9.

(quoting Anderson, 477 U.S. at 255)); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment.  Celotex, 477 U.S. at 330.  "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."  Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001). The non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial."  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005) (quotations omitted).  Under Anderson, Plaintiff's proffered evidence must be sufficient to meet the substantive evidentiary standard the jury would have to use at trial.  477 U.S. at 255.  To do so, the non-moving party must "go-beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324 (quotations omitted); see also Matsushita, 475 U.S. at 586; Ridgewood BD. Of Ed. V. Stokley, 172 F.3d 238, 252 (3d Cir. 1999).  In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the providence of the factfinder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc. 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323; Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992).

## III.   DISCUSSION

Pursuant to 42 U.S.C. § 1983, Kovalchik asserts two claims. He asserts an Eighth Amendment conditions of confinement claim against the individual officer and supervisory defendants, alleging that they failed to protect him from the assault by Torres. In addition, Kovalchik asserts a failure to train claim against the institutional defendants under Monell. To state either of his claims under section 1983, he "must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law." Vega v. Merlino, Civ. No. 04-6064, 2005 WL 1541061, *2 (D.N.J. Jun. 30, 2005) (citing West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994)).

## A.   Exhaustion of Remedies

At the outset, Defendants argue that Plaintiff has not exhausted the Correctional Facility's administrative grievance procedures. The Inmate Handbook direct inmates to file a grievance when faced with a dispute with another inmate. Recognizing that Kovalchik is not obligated under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), to exhaust internal remedies because he brought his suit after he was released, see

13

Ahmen v. Dragovich, 297 F.3d 201, 210 (3d Cir. 2002), Defendants nonetheless argue that "it is highly probative" that Kovalchik did not file any "grievance, notice, request, or any other document regarding any of the claims in his Complaint while he was in jail." Def. Open. Br. at 10.

The Court finds Defendants argument disingenuous.  Defendants take pain elsewhere in their briefing to highlight how quickly officers responded to the attack, how they rushed Kovalchik to medical care, and how Torres was disciplined and placed in administrative segregation.  As indicated *supra*, Defendants even rejected Torres' leniency request.  Clearly, with such a thorough response to the assault, there was no reason for Kovalchik to file a grievance.

Moreover, according to the Inmate Handbook, an inmate is "to try and solve [his] complaint on the lower level by discussing the problem with jail staff . . . before resorting to the grievance procedure."  Inmate Handbook at 12.  "Grievances are filed [only] if the informal means fail to answer/resolve the complaint."  Id.  at 13.  As soon as Kovalchik was approached by an officer following the assault, he informally complained that Torres had assaulted him, thereby complying with the Handbook's directives.  Thus, I reject Defendants contention that any failure to file a formal grievance holds probative value.

## B.    Eighth Amendment Claims

"The Eighth Amendment's prohibition on 'cruel and unusual punishment' . . . imposes on [prison officials] a duty to provide 'humane conditions of confinement."  Betts v. New Castle Youth Development, --- F.3d ----, 2010 WL 3528902, *4 (3d Cir. Sept. 13,

14

2010) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994)).  In that regard, prison officials have a duty to protect prisoners from violence at the hands of other prisoners." <u>Farmer</u>, 511 U.S. at 832 (quoting <u>Cortes-Quinones v. Jimenez-Nettleship</u>, 842 F.2d 556, 558 (1st Cir. 1988)) (internal quotation marks and ellipses omitted).  "While '[i]t is not ... every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for a victim's safety,' '[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society'."  <u>Hamilton v. Leavy</u>, 117 F.3d 742, 747 (3d Cir. 1997) (quoting <u>Farmer</u>, 511 U.S. at 834).

To survive summary judgment on an Eighth Amendment claim asserted under 42 U.S.C. § 1983, Plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; and (2) the defendants' deliberate indifference to that risk.  "[D]eliberate indifference is a subjective inquiry, while risk of harm is evaluated objectively."  <u>Betts</u>, 2010 WL 3528902 at *4 (citing <u>Atkinson v. Taylor</u>, 316 F.3d 257, 262 (3d Cir. 2003)).[4]

<u>Hamilton</u> is one of the leading failure-to-protect cases in this circuit.  That case involved inmate-on-inmate violence in the Delaware state prison system.  An inmate was assaulted two months after the prison's multidisciplinary team (MDT) recommended that he be placed in protective custody.  The MDT's recommendation, which had been rejected, came in response to the inmate's long history of being

_____

4      A few cases in the Third Circuit cite a third causation prong, while others do not. <u>Compare</u> <u>e.g.</u>, <u>Hamilton v. Leavy</u>, 117 F.3d 742, 747 (3d Cir. 1997); Davis v. Williams, 354 Fed.Appx. 603, 605-6 (3d Cir. 2009) <u>with</u> <u>Betts</u>, 2010 WL 3528902 at *4; <u>Counterman</u>, 2005 WL 5368398, * 8.  Here, Defendants have not argued that

assaulted by fellow prisoners because he was perceived as an informant.

The Third Circuit reversed a grant of summary judgment for Defendants, finding that the MDT could have taken "additional steps," after its recommendation was rejected.  117 F.3d at 749.  For example, the Circuit court found that the MDT could have placed Hamilton in administrative segregation and that the MDT's failure to take alternative courses of action "could be viewed by a factfinder as the sort of deliberate indifference to inmate safety" that would create Eighth Amendment liability.  Id.

For allegations of inmate misclassification, like those made here, the Third Circuit's decision in Counterman v. Warren County Correctional Facility, 176 Fed.Appx. 234 (3d Cir. 2006), is instructive.  In Counterman, the plaintiff ("Counterman") brought suit against the Warren County Correctional Facility ("WCCF"), and several of its employees and officials, for failing to protect him from a sexual assault he suffered at the hands of other inmates while incarcerated at WCCF.  Counterman alleged that he was designated as a "trustee" at WCCF, which entitled to him to greater freedom within the facility and expanded work experience.  Id. at 236.  On several occasions from March 29, 2002 onward, Counterman was assaulted verbally and sexually by three other trustee inmates, but those incidents were not reported.  Id. at 237.

Unfortunately, on August 17, 2002, Counterman was subjected to a more violent sexual assault by the three inmates.  Counterman argued that one of those inmates, Lombardo, was a "known violent inmate" and, as such, was improperly classified as a trustee.  Id.  Specifically, Counterman asserted that Corporal Border, WCCF's

Kovalchik's claim fails on a causation basis.

classification officer, "allowed Lombardo to gain trustee status despite 'a violent history of assaults against both inmates and public officers." Id. at 240.  Further, Counterman contended that WCCF's classification policy, which permitted an inmate with a prior criminal record and current violent crime charge to become a trustee, created an unacceptable risk to his safety as a fellow inmate.  Id.  In support of his classification challenge, Counterman presented an expert report.  The expert contended that WCCF's policy should have limited trustee assignments to only those inmates with "minor charges" and "no history of violence."  Counterman v. Warren County Correctional Facility, Civil Action No. 03-1974, 2005 WL 5368398, *19 (D.N.J. Jan. 27, 2005) aff'd 176 Fed. Appx. 234 (2006).

The Third Circuit reasoned that the expert's criticism of Border's classification of Lombardo "evince[d] only negligence, if any malfeasance at all." Counterman, 176 Fed. Appx. at 240.  Because negligent behavior is insufficient to demonstrate deliberate indifference, the court rejected Counterman's claim against the classification officer.

Finally, the Third Circuit's most recent failure-to-protect case, Betts, supra, provides further context for my decision.  Betts involved a claim based on injuries sustained by a juvenile inmate who suffered a spinal cord injury that occurred during a "pick up," tackle football game at a juvenile detention facility.  In affirming summary judgment against the injured plaintiff, the court reiterated that "an Eighth Amendment violation may not be predicated simply on exposure to any risk of serious harm; instead the risk must be "substantial."  2010 WL 3528092, *6 (quoting Helling v. McKinney, 509 U.S. 25, 33 (1993)).  The plaintiff's claim failed because he could not demonstrate that

17

"serious injury is a common or likely occurrence in tackle football games" or that "the risk complained of is one that society would refuse to tolerate." Id. Moreover, the Betts Court held that the plaintiff could not show deliberate indifference because, based on its substantial risk holding,  it was not "obvious that the risks associated with playing tackle football without equipment are unreasonable," and "there [wa]s no evidence of prior serious injuries resulting from resident football games at [the detention center]." Id. at *7.  Without these facts, the Court concluded, the plaintiff failed to create a genuine issue of material fact regarding deliberate indifference.

### 1.      Misclassification by Prison Officials

Here, Plaintiff first argues that Defendants are liable for failing to properly classify Torres.  If Torres had been properly classified as a medium security risk, so goes Kovalchik's argument, Torres would not have been assigned to the minimum-security work release pod where Plaintiff resided.  And, if Torres had not been assigned to the kitchen work pod, he could not have assaulted Plaintiff.

It is undisputed that Torres was misclassified; he was not entitled to the one-point stability deduction, and he should have not have been assigned to minimum security.[5]  Based on the aforesaid case law, however, the pertinent questions are

---

5      Plaintiff's expert also points to other factors that could have increased Torres' classification score, such as whether his prior simultaneous drug convictions constituted one or two convictions under the classification scale.   The Court need not address these other potential increases in Torres' score because the clearly erroneous stability deduction, in and of itself, resulted in Torres' minimum security classification.

whether the misclassification created a substantial risk of harm and whether the prison officials were deliberately indifferent to that harm.

>    **(a)    Substantial Risk of Harm**

The Supreme Court's decision in <u>Helling</u>, <u>supra</u>, sets forth the framework for evaluating whether an inmate has satisfied the objective, substantial risk of harm, component.  In order to satisfy this objective component, Kovalchik must establish: (1) the seriousness of the injury, (2) a sufficient likelihood that serious injury would result from misclassifying Torres and placing him in the minimum security pod, and (3) that the risks associated with placing Torres in the minimum security pod violated contemporary standards of decency.  <u>See</u> <u>Betts</u>, 2010 WL 3528902 at *5 (discussing <u>Helling</u>, 509 U.S. at 35).  Here, Kovalchik has satisfied the first element, seriousness of injury, because he suffered a fractured orbital bone and fractured sinus cavity.  As to the last element, whether the risk associated with his misclassification violated contemporary standards of decency, "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." <u>Farmer</u>, 511 U.S. at 834.  The more involved question is whether Torres posed a sufficient likelihood of serious injury.

Kovalchik argues that Torres posed a great risk because of his "violent tendencies, . . . prior institutional disciplinary history, multiple felony convictions, and evidence of gang affiliation …." and gang tattoo.  Pl. Opp. at 7-8.  While Torres' prior conviction(s) for possession of drugs was not violent, he was arrested and awaiting trial on a charge of aggravated assault against a law enforcement officer.  That his current

charge was for aggravated assault is significant because it suggests an increased level of violence as compared to a simple assault charge.  Moreover, Torres' institutional history indicates that he had been disciplined for using "abusive/obscene language" with institutional staff, and for fighting.[6]  Institutional History at 3.  In addition, he was previously segregated from a fellow inmate, though the history does not specify the basis for the segregation.  Id. at 2.  And, according to Kovalchik's testimony, Torres was placed in administrative segregation shortly after he arrived because of involvement in gang-related activity.  Kovalchik Dep. at 58:4-24.  Finally, Kovalchik contends that Torres fell within several special management risk categories on the inmate classification form (e.g., Serious Violent Threat, Known Gang Affiliation, and Known Management Problem).  If Defendant Fleming had actually "checked off" one or more of these categories, Torres could have been designated a maximum security risk.

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that combination of Torres' criminal and institutional histories, his placement in administrative segregation, and his falling within several special management risk categories constitute facts from which a jury could conclude that there existed a sufficient likelihood that serious injury would result from misclassifying him and placing him in the minimum security pod.  Accordingly, the Court rejects Defendant's argument that Torres' misclassification did not pose a substantial risk of harm.  Thus,

---

[6]    While the intake and classification officers were not aware of Torres' institutional history at the time of his booking and classification, the history is still relevant to the substantial risk of harm analysis because Kovalchik argues that the Defendant Fleming improperly failed to investigate Torres' institutional history.  The legal import of the

the Court now turns to whether Kovalchik has presented sufficient facts from which a jury could conclude that Defendants' were deliberately indifferent.

### (b)    Deliberate Indifference

"To overcome a motion for summary judgment, a plaintiff must come forward with evidence from which it can be inferred that the defendant-officials were ... knowingly and unreasonably disregarding an objectively intolerable risk of harm." Betts, 2010 WL 3528902, *7 (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 132 (3d Cir. 2001)) (internal quotation marks omitted).  In Betts, the Third Circuit explains that deliberate indifference may be demonstrated, for example, "by showing that the risk of harm was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past' such that the defendants 'must have known' about the risk."  Id. (quoting Farmer, 511 U.S. at 842-43).  In short, "[d]eliberate indifference is more than a mere lack of ordinary due care, however; it is a state of mind equivalent to a reckless disregard of a known risk of harm."  Vega v. Merlino, Civ. No. 04-6064, 2005 WL 1541061, *3 (D.N.J. Jun. 30, 2005) (citing Farmer, 511 U.S. at 834).  As noted, the test is a subjective one.  Thus, an official

> would not escape liability if the evidence showed that he merely refused to verify underlying facts *that he strongly suspected to be true*, or declined to confirm inferences of risk that *he strongly suspected to exist* (as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation . . .) ....

511 U.S. at 843, n. 8 (emphasis added).  In making the deliberate indifference

officers' lack of knowledge will be discussed in my deliberate indifference analysis.

assessment, courts must "focus [on] what a defendant's mental attitude actually was (or is), rather than what it should have been (or should be)." <u>Hamilton</u>, 117 F.3d at 747 (quoting <u>Farmer</u>, 511 U.S. at 839). Because deliberate indifference is a subjective test, the Court must individually address the evidence with regard to each defendant. To that task, I now turn.

### (i)    Defendant Lauyer

Kovalchik's claim against Defendant Lauyer fails. As the booking officer who processed Torres' intake, the record indicates that Lauyer did not classify Torres. It was Fleming who made the classification decision. Lauyer simply completed the Initial Intake Form, denoting that Torres had an "OCG" tattoo, and advised him as to his right to attend the classification hearing. Patti Cert., Exh. AA at 1-2. She was also responsible for completing the Booking Checklist, which required her to confirm his committing documents and obtain his background information. <u>Id.</u> at 3. Nothing on the Booking Checklist indicates that she was required to request or review prior institutional history data.

### (ii)    Defendant Fleming

As to Defendant Fleming, Kovalchik argues that he miscalculated Torres' classification score by erroneously giving Torres a one-point "stability" deduction when he had been housed at a correctional facility during the prior year. According to Kovalchik, the stability deduction is meant for those inmates who lived at a single residence in the community for the year preceding incarceration. Upon review of the intake and classification forms, however, the forms do not define "stability" in the

22

manner Kovalchik suggests.  The Initial Custody Assessment Form defines stability as "[l]ived at same address for 12 months prior to arrest."  Id. at Exh. CC.  While the Court agrees with Kovalchik that it seems counterintuitive that an inmate should get a classification deduction for being incarcerated, and that "address" does not likely refer to a correctional facility, Fleming's decision to grant him Torres that deduction was negligent "if any malfeasance at all."  Counterman, 176 Fed.Appx. at 240.  Such negligence cannot form the basis of an Eighth Amendment failure to protect claim.

Kovalchik, further, argues that Fleming had an obligation to investigate Torres' institutional history prior to classifying him.  Failing to consider the institutional history, Kovalchik contends, constitutes recklessness.  Fleming stated in his deposition testimony that he did not seek out Torres' institutional history.  In fact, Fleming did not consider it his responsibility to do so.  Rather, in classifying an inmate, he looks only to the prisoner's charge, status, and whether there are any pending detainers.  Fleming Dep. at 60:1-20.  The only other document he consults is a criminal history background check.  Id.  If no institutional history arrives with the inmate, it is Fleming's practice to proceed without it.

The Court finds Fleming's practice of not investigating an inmate's institutional history perplexing in light of the classification scale's inclusion of that category.  The Initial Custody Assessment Form explicitly designates a category for "INSTITUTIONAL DISCIPLINARY HISTORY."  In that category, an inmate is to be awarded no points for "NONE" or "Minor with no segregation time."  But, for "1 or more major disciplinary reports and/or time in segregation," an inmate is to be accorded 3

23

points.  Patti Cert., Exh. CC at 1.  A reasonable jury could conclude, from the form's inclusion of the category, that Fleming was on notice that an inmate's institutional history is important and should factor into the inmate's classification score.

The Supreme Court reasoned in <u>Farmer</u> that an official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist …." 511 U.S. at 843, n. 8 (emphasis added).  Here, Kovalchik has pointed to several facts from which a jury could conclude that Fleming was aware that information affecting Torres' classification lurked in the institutional history and that Fleming turned a blind eye to it.  First, Torres' current charge was for aggravated assault against a law enforcement officer.  Second, Torres was charged with that offense *in an institutional setting*.  Both of these facts were known to Fleming at the time he classified Torres.[7]  From this circumstantial evidence, joined with Fleming's own testimony that he routinely refuses to investigate an inmate's institutional history, a jury could infer that Fleming "declined to confirm inferences of risk that he strongly suspected to exist."  <u>Id.</u>

Otherwise put, these facts provide sufficient basis for a jury to conclude that Fleming acted recklessly by perceiving a risk to inmate safety and intentionally

---

[7]     These sorts of facts, *i.e.*, the inclusion of inmate history on the classification form, Torres' current charge for aggravated assault against a Law Enforcement Officer, and Fleming's statement that he routinely declines to investigate institutional history, render <u>Counterman</u> distinguishable where, in that case, there was insufficient evidence from which a jury could conclude that the defendant officers knew of a risk to inmate safety.

ignoring that risk.  Id. at 837 (clarifying that deliberate indifference standard equates to recklessness, which is shown by proving that "the official knows of and disregards an excessive risk to inmate . . . safety …."). Even if Fleming were to testify at trial that he "believed (albeit unsoundly) that the risk to which the facts give rise was insubstantial or nonexistent," id. at 844, the jury would nonetheless be free to "infer from the obvious" that he was in fact aware.  Accordingly, Kovalchik has demonstrated sufficient facts from which a jury could conclude that Fleming was deliberately indifferent.

### (iii)   Defendant Walker

With regard to Defendant Walker, Kovalchik argues that he acted with deliberate indifference by failing to recommend that Torres be reclassified out of work release in light of the gang allegations made against him.  Characterizing his investigation of the gang allegations as "cursory," Kovalchik points the following facts as indicative of Walker's purported deliberate indifference:  (a) Walker merely asked Torres if he was in a gang; (b) he did not interview the other inmates in the work release pod; (c) he failed to accord any weight to the "OGC" tattoo on Torres' arm; and (d) he did not seek supervisory input on his findings.  Pl. Opp. Br. at 13.

Indeed, Walker's investigation was not as thorough as one might expect.  Walker's report states that the other inmate alleged to have engaged in gang activity told him that the allegations were racially motivated; however, that Torres had a gang-related tattoo and was unlikely to admit any gang activities should have factored into Walker's report.  But such a dereliction on Walker's part amounts to negligent— not

reckless—conduct.  Hence, summary judgment is appropriate on the claim against Walker.

### (iv)   Defendants Wagner and Nodes

In Beers-Capitol, supra, the Third Circuit set out the standard for establishing that a supervisor was deliberately indifferent.  That case involved juvenile female inmate-plaintiffs who were sexually exploited by a male corrections officer.  The Beers-Capitol panel, although recognizing that the risk of sexual misconduct by inmates was sufficiently well-known to be the subject of staff training sessions and even the impetus behind a policy limiting male officer contact with inmates, did not find the hypothetical risk of sexual misconduct by corrections officers sufficient to infer that the defendant supervisors were deliberately indifferent.  The panel explained that the more relevant consideration regarding evidence of supervisor liability was the extent of the supervisor's knowledge about an actual pattern of sexual abuse by corrections officers. 256 F.3d at 137-38.

In addition, Beers-Capitol clarifies the distinction between direct liability against a supervisor, and supervisory liability for the actions of one's subordinates.  In terms of liability for the actions of one's subordinates, *respondeat superior* cannot serve as the basis of personal liability against a supervisor in a civil rights action.  See Rode v. Dellarciprete, 845 F.2d 1195, 1207-08 (3d Cir. 1988); Hooks v. Schultz, Civ. No. 07-5627, 2009 WL 777394, (D.N.J. Mar. 19, 2009).  Rather, "supervisory personnel are only liable for the § 1983 violations of their subordinates if they knew of, participated in or acquiesced in such conduct." Hooks, 2009 WL 777394 at *8 (quoting Capone v.

26

<u>Marinelli</u>, 868 F.2d 102, 106, at n. 7 (3d. Cir. 1989)) (citation omitted).

In terms of direct liability, a supervisor may be held liable for his or her own conduct. So, a supervisor who fails to properly train his employees may be liable under section 1983. <u>Beers-Capitol</u>, 256 F.3d at 139. And a supervisor who, by her own actions, violates a prisoner's rights may be held liable for her conduct. By way of example, the defendant youth development aid in <u>Beers-Capitol</u>, who dissuaded one of the female inmates from reporting the sexual abuse and delayed reporting the abuse accusations to her supervisor, was denied summary judgment on account of her own actions. <u>Id.</u> at 143.

Here, Wagner and Nodes supervised Fleming and other officers involved in the classification process. Contending that Wagner and Nodes had little understanding of the classification system, Kovalchik argues (in terms of direct liability) that they failed to adequately train classification officers, such as Fleming, by "allowing staff to simply train each other without guidance or specific instruction from upper management …." Pl. Opp. Br. at 17. This argument must be rejected. The Eighth Amendment does not dictate who is to train prison officials.[8] To the contrary, Fleming's deposition testimony indicates that he was trained by Jim Smith, who went over each category on the classification form with him. Fleming Dep. 89:2-5. The record does not indicate Jim Smith's position and, therefore, provides no factual support for Kovalchik's contention.

To the extent Kovalchik argues that Wagner and Nodes are liable for Fleming's

---

[8] To be clear, Plaintiff does not challenge the substance of the training Fleming received.

misclassification, I reject that argument as well.  Although the Court determined that there are sufficient facts from which a jury could conclude that the misclassification created an unreasonable risk, Kovalchik has not pointed to any evidence indicating that Wagner or Nodes was subjectively aware of that risk.  Accord id. at 137-38.  As noted, *respondeat superior* may not serve as the basis for a claim against supervisors.  Accordingly, Wagner and Nodes are entitled to summary judgment.

### 2.    Prison Official's Failure to Enforce Jail Rules

Kovalchik argues that the failure to enforce jail rules led to his assault.  Specifically, he contends that Defendants routinely failed to enforce the Inmate Handbook rules prohibiting an inmate from entering another inmate's cell and from hanging things over the cell window that block the view inside the cell.  This same sort of lax-enforcement-of-rules argument was also rejected in Counterman, where the plaintiff argued that his correctional facility failed to enforce the rule that inmates could not prop open doors that would permit to travel between cell blocks in the work release area.  According to the district court in Counterman, "the practice of leaving cell block doors open supports at most a negligence claim."  2005 WL 5368398 at * 18.  The Third Circuit affirmed the district court on this point, further commenting that "[w]hile the intermingling may have had something to do with the tribulations Counterman faced as an inmate, he does not point to evidence in the record that shows awareness that WCCF policy or practice created an unacceptable risk of their occurrence."  Counterman, 176 Fed. Appx. at 241.  Here, as in Counterman, HCDPS's lax enforcement of the cell rules may have had something to do with the assault by Torres.

28

But, just as in <u>Counterman</u>, Kovalchik has not pointed to any evidence that HCDPS was aware that its lax enforcement created an unacceptable risk that inmates, such as Kovalchik, would be assaulted by Torres.

Because Kovalchik has failed to demonstrate deliberate indifference with respect to Defendants Lauyer, Walker, Wagner, and Nodes the Court need not address qualified immunity with respect to those defendants. <u>See</u> <u>Betts</u>, 2010 WL 3528902, *7 (declining to address qualified immunity where no Eighth Amendment violation found against defendants); <u>Beers-Capitol</u>, 256 F.3d at 142 n. 15. The following discussion applies only to Defendant Fleming.

### 3. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known'." <u>Bayer v. Monroe County Children & Youth Servs.</u>, 577 F.3d 186, 191 (3d Cir. 2009) (<u>quoting</u> <u>Pearson v. Callahan</u>, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)). More simply stated, qualified immunity is "an entitlement not to stand trial or face the burdens of litigation." <u>Mitchel v. Forsyth</u>, 472 U.S. 511, 526 (1985). This defense strikes a balance, shielding those officers from liability that mistakenly, but reasonably believed their actions were lawful while permitting a plaintiff to recover against those defendants that knowingly violated the plaintiff's rights. <u>Curley v. Klem</u>, 499 F.3d 199, 206-07 (3d Cir. 2007).

In assessing whether qualified immunity applies, courts consider two inquiries:

(i) whether the facts alleged, when viewed in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (ii) whether the right that was [allegedly] violated was clearly established, *i.e.*, whether it would be clear to a reasonable officer that his or her conduct was unlawful in the situation he or she confronted. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001) <u>overruled in part by</u> <u>Pearson</u>, 129 S.Ct. at 818. <u>Pearson</u> relaxed the rigid two-step application of the <u>Saucier</u> analysis in favor of a more flexible approach that permits the judges of district courts and courts of appeals "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." 129 S.Ct. at 818.

In light of the Supreme Court's decision in <u>Pearson,</u> 129 S.Ct. at 818, the Court need not determine the first step of the qualified immunity analysis. Instead, the Court focuses on the second step, which is: "whether the right that was violated was clearly established or, in other words, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted'." <u>Curley v. Klem</u>, 499 F.3d at 207 (<u>quoting</u> <u>Saucier</u>, 533 U.S. at 202). Reasonable mistakes regarding what the law requires are still entitled to qualified immunity. <u>Green v. N.J. Police</u>, 246 Fed.Appx. 158, 162 (3d Cir. 2007). Thus, Plaintiff's claim can only survive the second step of the qualified immunity analysis if, given his version of events, there is no room for reasonable disagreement among reasonable prison officers as to the lawfulness of Defendants' actions.

In support of the instant motion, Defendants claim that negligent actions by a

police officer do not give rise to constitutional violations under Section 1983. Daniels v. Williams, 474 U.S. 327, 328 (1986). They contend that qualified immunity provides significant room for mistaken judgments by protecting all but the *plainly incompetent* or those who *knowingly* violate the law. However, their interpretation of the law is inaccurate. Qualified immunity applies a test of reasonableness, such that a defendant is entitled to qualified immunity only if he or she can show that a reasonable person in his or her position at the relevant time could have believed, in light of clearly established law, that his or her conduct comported with established legal standards. Beers-Capitol, 256 F.3d at 142, n.15 (citing Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989)). "[R]easonableness is measured by an objective standard; arguments that the defendants desired to handle or subjectively believed that they had handled the incidents properly are irrelevant." Id. (citing Anderson v. Creighton, 483 U.S. 635, 641 (1987)).

There is no question that the Plaintiff's constitutional right to not to be physically assaulted while incarcerated was clearly established at the time of Torres' attack of Plaintiff. See Farmer, 511 U.S. at 833-34. The doctrine of deliberate indifference was also clearly established at the relevant time, as Farmer establishes a prison-official's duty to protect prisoners from violence at the hands of other prisoners when a distinct heightened risk of harm is known. Beers-Capitol, 256 F.3d at 144. Drawing all inferences in the Plaintiff's favor, there seems no room for reasonable disagreement among reasonable officers as to Defendant Fleming's failure to take appropriate measures to ensure a safe jail. Specifically, Defendant Fleming

31

unreasonably failed to accurately classify Torres on the facility's custody scoring scale, based on his Institutional Disciplinary History and Prior Indictable Convictions score. His doing so allowed Torres access to the minimum security pod and kitchen work-duty.  Defendants offer no reasonable explanation to justify this misclassification of Torres.  See Hooks, 2009 WL 777394 (where federal prison warden was not entitled to qualified immunity in an Eighth Amendment action by a prisoner who was assaulted at the hands of a fellow inmate who had been diagnosed as delusional and assaultive when it would have been clear to a reasonable officer that the Defendants' failure to properly classify and supervise inmates violated a "clearly established" constitutional right). Furthermore, Fleming has not pointed to any case law upon which "a reasonable person in [his] position at the relevant time could have believed, in light of clearly established law, that [his] conduct comported with established legal standards." Beers-Capitol, 256 F.3d at 142 n. 15.

Accordingly, Defendant Fleming is not entitled to the defense of qualified immunity in connection with Plaintiff's claim that Defendant Fleming failed to protect Kovalchik against intra-inmate violence and Defendants' motion for summary judgment on the basis of the qualified immunity defense is denied as to Defendant Fleming.  Accord Beers-Capitol, 256 F.3d at 142 ("[T]o the extent that the plaintiffs have made a showing sufficient to overcome summary judgment on the merits, they have also made a showing sufficient to overcome any claim to qualified immunity.") A jury will have to decide the facts based on its assessment of the evidence and then, based upon those proven facts, whether Defendant Fleming acted with deliberate

indifference toward a substantial risk to Plaintiff's safety.

### 4.   <u>Monell</u> Claim

Municipalities and other government bodies may be sued under Section 1983. <u>Monell v. New York City Dep't of Soc. Servs.</u>, 436 U.S. 658, 690-92 (1992).   The plaintiff must establish: (1) the municipality had a policy or custom that deprived him or her of his or her constitutional rights; (2) the municipality acted deliberately and was the moving force behind the deprivation; and (3) his or her injury was caused by the identified policy or custom.   <u>Bd. of the County Comm'rs v. Brown</u>, 520 U.S. 397, 403-04 (1997) (<u>citing</u>, <u>Monell</u>, 436 U.S. at 690-91, 694). Liability may not be imposed solely on a *respondeat superior* theory.   <u>Monell</u>, 436 U.S. at 692.   Rather, Section 1983 only "imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights."   <u>Id.</u>

In that regard, "[a] supervising authority may be liable under § 1983 for failing to train police officers when the failure to train demonstrates deliberate indifference to the constitutional rights of those with whom the officers may come into contact …." <u>Giles v. Davis</u>, 427 F.3d 197, 207 n.7 (3d Cir. 2005) (citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989)).   To prevail on a failure to train claim, a plaintiff "must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." <u>Id.</u> (quoting <u>Reitz v. County of Bucks</u>, 125 F.3d 139, 145 (3d Cir. 1997)).

33

In <u>Counterman</u>, the Third Circuit rejected the inmate-plaintiff's claim against the defendant-correctional facility for its classification policy, reasoning that despite the "less-than-saintly record" of the misclassified inmate, the court could "discern no conscious disregard of an unacceptable risk to inmates from . . . the policy . . . ."  176 Fed.Appx. at 240.  Kovalchik's arguments based upon the HCDPS's classification policy must likewise be rejected.  For one, Kovalchik has not pointed to any record evidence demonstrating that the County Defendants were aware of misclassification risks and deliberately indifferent to that risk.  He could demonstrate this, for example, by showing that there were prior incidents of misclassification and that inmates were harmed as a result.  But he has presented no such evidence.  Accordingly, summary judgment is appropriate as to the County Defendants.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to all defendants except for Fleming, and denied as to Fleming.  An accompanying Order will be entered.


/s/ Freda L. Wolfson_____
Hon. Freda L. Wolfson, U.S.D.J.

Dated:  September 21, 2010

34